# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ERIC HOUSEKNECHT, | No. 4:20-CV-01233 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| DAVID YOUNG, DONALD MAYES, JODY MILLER, and DUSTIN REEDER, | |
| Defendants. | |

## MEMORANDUM OPINION

### APRIL 13, 2023

Plaintiff Eric Houseknecht, a police officer of the City of Williamsport Bureau of Police ("WBP") sues four other current and former WBP officials, former WBP police chief David Young, Captain Donald Mayes, former Captain Jody Miller, and Sergeant Dustin Reeder for retaliating against him for exercising his First Amendment right to associate with the Fraternal Order of Police ("FOP"), a public union. Houseknecht's allegations arise from an internal investigation into his alleged violation of WBP policies and procedures after he was promoted to corporal. He alleges that the investigation and consequent discipline were motivated by his union association. Defendants now jointly move for summary judgment on Houseknecht's First Amendment claim. For the following reasons, the Court denies Defendants' motion.

I.      BACKGROUND

    A.      Underlying Facts[1]

Houseknecht was promoted to corporal in March 2017.[2] Houseknecht also served in a few different capacities in Lodge 29 of the FOP, the relevant union for WBP officers.[3] At the time, Young was the chief of the WBP until he resigned in April 2019.[4] Miller and Reeder served as Houseknecht's supervisors.[5] Reeder was also an FOP member and Mayes was a former member.[6]

In 2017, Young became aware of a growing list of procedural infractions on Houseknecht's part, but it is unclear how or from whom Young learned that information.[7] Young thereafter assigned Mayes to investigate Houseknecht's alleged misconduct.[8] Mayes eventually produced an Internal Investigation Report detailing his findings.[9]

At Mayes' request, Reeder provided information on his relationship with Houseknecht, indicating that Reeder believed that Houseknecht had a high number of "open" cases dating back to 2014 and was "deficient in time management and/or lack[ed] self-motivation with regard to his duties," such that Reeder believed he

---

1    The following facts are undisputed unless otherwise indicated.
2    Defs.' Statement of Undisputed Material Facts ("SUMF"), Doc. 34 ¶ 2; Houseknecht Response to Statement of Undisputed Material Facts ("RSUMF"), Doc. 38 ¶ 2.
3    SUMF, Doc. 34 ¶¶ 9-10; RSUMF, Doc. 38 ¶¶ 9-10.
4    SUMF, Doc. 34 ¶¶ 4-5; RSUMF, Doc. 38 ¶¶ 4-5.
5    SUMF, Doc. 34 ¶¶ 6-8; RSUMF, Doc. 38 ¶¶ 6-8.
6    See SUMF, Doc. 34 ¶¶ 11-12; RSUMF, Doc. 38 ¶¶ 11-12.
7    SUMF, Doc. 34 ¶ 26; RSUMF, Doc. 38 ¶ 26; See Dep. of David Young, Doc. 34-1 at 22:1-23.
8    SUMF, Doc. 34 ¶¶ 27-28; RSUMF, Doc. 38 ¶¶ 27-28.
9    Internal Investigation Report, Doc. 34-5.

"may not be a good role model for the young officers."[10] Reeder also commented negatively on Houseknecht's personality, despite stating that he had "no personal or work-related conflicts" with him.[11]

Mayes' Report then detailed twenty-six "deficiencies" in Houseknecht's performance with associated violation of WBP rules and policies. The Report began with Houseknecht's alleged failures in timely completing his paperwork on active cases from 2014 to 2017.[12] It acknowledges that after being directed to, Houseknecht caught up with his paperwork.[13] Reeder apparently identified Houseknecht's tardiness after Houseknecht was promoted to corporal.[14] The Report identified as the third deficiency Houseknecht's failure to complete late reports after being given a deadline.[15] The Report also indicates that Houseknecht was insubordinate in his responses to Reeder's efforts to discipline him.[16] Deficiency seven also involved the failure to timely review "training files."[17] Deficiency sixteen also related to late reports, as did twenty and twenty-five.[18]

Deficiencies four, five, twenty-one, and twenty-two were Houseknecht's failures to timely complete online trainings.[19] Houseknecht responded to deficiency

---

[10]   *Id.* at 17-18.
[11]   *Id.* at 18.
[12]   *Id.* at 33
[13]   *Id.*
[14]   *Id.*
[15]   *Id.* at 39.
[16]   *See id.* at 41.
[17]   *Id.* at 55.
[18]   *See id.* at 87, 100.
[19]   *Id.* at 42-50, 106, 110.

twenty-two by stating that he completed the training but was unaware that he had to retake an assessment because Miller did not inform him that he was required to retake it.[20] Deficiencies seventeen and eighteen identified erroneous reports that Houseknecht approved or failed to properly review as a supervisor.[21] Deficiency twenty-four involved similar issues.[22]

Several deficiencies related to scheduling issues. The second deficiency was Houseknecht's failure to appear for his first day as a WBP corporal in 2017.[23] Houseknecht claimed to have been confused about when his vacation began because he had just switched shifts upon his promotion.[24] The Report noted that this was the first time Houseknecht ever failed to appear in the period investigated.[25] Deficiency eighteen was a failure to appear for a scheduled court appearance.[26] Deficiency fourteen also involved a scheduling issue with another officer in which Houseknecht failed to put the officer's leave on the WBP master schedule.[27] Deficiency nine related to Houseknecht's offering a probationary officer overtime when it should have gone to a more senior officer, which Mayes considered "overtime manipulation."[28] Deficiency ten related to Houseknecht's taking leave for a funeral

---

[20]   *See id.* at 110-13; Houseknecht Dep., Doc. 34-10 at 104:13-106:14.
[21]   Internal Investigation Report, Doc. 34-5 at 90, 98.
[22]   *See id.* at 122.
[23]   *Id.* at 34.
[24]   *See* Dep. of Eric Houseknecht, Doc. 34-10 at 138:21-141:13.
[25]   Internal Investigation Report, Doc. 34-5 at 39.
[26]   *Id.* at 93.
[27]   *Id.* at 81.
[28]   *Id.* at 64.

without notifying his supervisor or anyone else.[29] Houseknecht responded that he put his leave on the master schedule.[30] Deficiency twenty-three involved an incident during which Houseknecht entered medical leave for another officer whose wife had gone into labor.[31] The next day, someone changed the leave entry, and Houseknecht changed it back, apparently in violation of WBP policy.[32]

Other deficiencies related to failures to adhere to WBP procedures. Deficiency six identified his failure to contact a detective following an armed robbery as per WBP procedure.[33] Deficiency eight involved an incident with a former WBP officer, Jeffery Paulhamus.[34] In May 2017, Houseknecht responded to an incident at Paulhamus' residence after Paulhamus' girlfriend called 9-1-1 because he expressed suicidal ideation, was under the influence of alcohol, and was in his truck with two firearms in his possession.[35] Houseknecht recalls being the only officer on duty in Williamsport because the rest of the officers on duty were in pursuit of a fleeing suspect.[36] Houseknecht failed to notify the officers on the next shift of the incident.[37] Deficiency thirteen involved Houseknecht sending a blank reply email to an email from Mayes that requested confirmation of receipt.[38] Deficiency fifteen involved

---

[29]   *Id.* at 67.
[30]   *Id.*
[31]   *Id.* at 117.
[32]   *Id.* at 117-21.
[33]   *Id.* at 52-54.
[34]   *See* Houseknecht Dep., Doc. 34-10 at 147:15-153:6.
[35]   *Id.*; Internal Investigation, Doc. 34-5 at 59.
[36]   Houseknecht Dep., Doc. 34-10 at 149:13-150:4.
[37]   Internal Investigation, Doc. 34-5 at 57.
[38]   *Id.* at 78.

Houseknecht's failure to inform his superiors about a shooting incident.[39] Houseknecht acknowledged his failure and blamed his lack of training.[40]

Other deficiencies related to Houseknecht's responses to and conduct towards his superiors. Deficiency eleven was an insubordinate comment Houseknecht allegedly made that he only took the corporal position to "piss off" members of the WBP administration.[41] Reeder reported Houseknecht making the statement to another corporal.[42] Mayes interviewed the corporal to whom the statement was made, and he claimed that Reeder "took his statements about Houseknecht the wrong way or misunderstood" them.[43] Deficiency twelve related to Houseknecht's response to an email from Miller regarding parents' ability to park near a sign that indicated the area was for pickup—Houseknecht apparently questioned whether the sign in question was supported by ordinance.[44] Twenty-six was an insubordinate email Houseknecht sent Reeder after Reeder unknowingly did a training while logged in as Houseknecht.[45]

Mayes ultimately concluded that Houseknecht did not exhibit the "willingness or ability to reasonably and effectively operate as a police officer—let alone a police

---

[39]   *Id.* at 83.
[40]   *See id.* at 83.
[41]   *Id.* at 71.
[42]   *Id.* at 71-72.
[43]   *Id.* at 72.
[44]   *Id.* at 74.
[45]   *Id.* at 128.

supervisor."[46] He listed about forty different negative "issues" with Houseknecht's performance.[47]

Mayes' Report also mentioned Houseknecht's association with the FOP at times. Mayes explained that Houseknecht "[took] part in some or most of the FOP/Administration negotiations pertaining to job descriptions" for WBP staff, and at one point apparently walked out of a meeting while making "rude comments."[48] In the conclusion section, Mayes explained that "Houseknecht appears to be more concerned with playing games, perpetuating personal agendas, and acting in the capacity of a quazi-junior [sic] FOP attorney rather than fulfilling his duties and responsibilities as a sworn police officer and more importantly a police supervisor."[49]

In August 2017, Houseknecht was suspended with pay pending the outcome of the Internal Investigation.[50] Young received the report and conveyed its findings to Houseknecht in January 2018 via a shorter memo summarizing the Report.[51] Young reviewed the report and agreed with its findings.[52] He then issued another memo to Houseknecht indicating that he committed ninety-seven different policy

---

[46]   *Id.* at 131.
[47]   *See id.* at 130.
[48]   *Id.* at 18.
[49]   *Id.* at 131.
[50]   SUMF, Doc. 34 ¶ 33; RSUMF Doc. 38 ¶ 33.
[51]   Young Dep., Doc. 34-1 at 14:17-15:12; Jan. 11, 2018 Memo from Young to Houseknecht, Doc. 34-9.
[52]   Young Dep., Doc. 34-1 at 15:13-17:12.

violations based on Mayes' Report and that he would be demoted back to patrolman and suspended for twenty-six days.[53]

Young referred to the string of violations as part of a "continuing course of conduct."[54] He also acknowledged that parts of Mayes' Report were opinionated but claimed that those portions did not influence his decisions on upholding any of the alleged policy violations.[55] Young acknowledged that another internal investigation report into a high-speed pursuit involving Houseknecht did not contain references to the character or work ethic of the officers involved.[56] But he maintained that he thought Mayes was impartial in the Report.[57]

Houseknecht was demoted from his position as corporal and suspended for twenty-six days as a result of the Internal Investigation.[58] As required, the Williamsport City Council approved his suspension in July 2018 and voted to terminate him.[59] Houseknecht filed a grievance and eventually settled with WBP.[60]

## B.     Procedural History

Houseknecht filed a Complaint under 42 U.S.C. § 1983, alleging that Defendants retaliated against him for exercising his First Amendment right of

---

[53]   Mar. 29, 2018 Memo from Young to Houseknecht, Doc. 34-11 at 2.
[54]   Young Dep., Doc. 34-1 at 21:5-14.
[55]   *Id.* at 30:3-22.
[56]   *Id.* at 33:12-34:6.
[57]   *Id.* at 34:18-35:21.
[58]   SUMF, Doc. 34 ¶ 46; RSUMF Doc. 38 ¶ 46.
[59]   SUMF, Doc. 34 ¶¶ 48-49 33; RSUMF Doc. 38 ¶¶ 48-49.
[60]   SUMF, Doc. 34 ¶¶ 50-51 33; RSUMF Doc. 38 ¶¶ 50-51.

freedom of association.[61] He seeks compensatory and punitive damages, as well as attorneys' fees and costs of suit.[62] Defendants jointly move for summary judgment on his claims.[63] Their motion has been fully briefed and is ripe for disposition.

## II.   LAW

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." As the Supreme Court of the United States expressed in *Celotex Corp. v. Catrett*, summary judgment is required where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case" on an issue that the "party will bear the burden of proof at trial."[64]

Material facts are those "that could alter the outcome" of the litigation, "and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[65] A defendant "meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[66] Conversely, to survive summary

---

61   Compl., Doc. 1 ¶¶ 55-63.
62   *Id.* at 11.
63   MSJ, Doc. 33.
64   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).
65   *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010) (quoting *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993)).
66   *Clark*, 9 F.3d at 326.

judgment, a plaintiff must "point to admissible evidence that would be sufficient to show all elements of a *prima facie* case under applicable substantive law."[67]

The party requesting summary judgment bears the initial burden of supporting its motion with evidence from the record.[68] When the movant properly supports its motion, the nonmoving party must then show the need for a trial by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[69] The United States Court of Appeals for the Third Circuit explains that the nonmoving party will not withstand summary judgment if all it has are "assertions, conclusory allegations, or mere suspicions."[70] Instead, it must "identify those facts of record which would contradict the facts identified by the movant."[71]

In assessing "whether there is evidence upon which a jury can properly proceed to find a verdict for the [nonmoving] party,"[72] the Court "must view the facts and evidence presented on the motion in the light most favorable to the nonmoving party."[73] Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule

---

[67]  *Id.*
[68]  *Celotex Corp.*, 477 U.S. at 323.
[69]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).
[70]  *Betts v. New Castle Youth Dev. Ctr*, 621 F.3d 249, 252 (3d Cir. 2010).
[71]  *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002) (quoting *Childers v. Joseph*, 842 F.2d 689, 694-95 (3d Cir. 1988)).
[72]  *Liberty Lobby*, 477 U.S. at 252 (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 448 (1871)).
[73]  *Razak v. Uber Technologies, Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).

56(c)," the Court may "consider the fact undisputed for purposes of the motion."[74]

Finally, although "the court need consider only the cited materials, . . . it may

consider other materials in the record."[75]

## III.   ANALYSIS

Our Court of Appeals recently reiterated the standard for First Amendment

claims premised on the plaintiff's freedom of association in *Baloga v. Pittston Area*

*School District*, which also involved a union member claiming retaliation under 42

U.S.C. § 1983.[76] To prevail on such a claim, a plaintiff must prove that (1) "he

engaged in 'constitutionally protected conduct,'" (2) "the defendant engaged in

'retaliatory action sufficient to deter a person of ordinary firmness from exercising

his constitutional rights,'" and (3) "a causal link [existed] between the

constitutionally protected conduct and the retaliatory action."[77] The first element is

an issue of law; the second two are issues of fact.[78]

Defendants do not dispute that Houseknecht has satisfied first element of the

test and concede that the City Council's vote to terminate Houseknecht's

employment constitutes an adverse action sufficient to meet the second element.[79]

---

[74]   Fed. R. Civ. P. 56(e)(2); *see also Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613-14 (3d Cir. 2018).

[75]   Fed. R. Civ. P. 56(c)(3).

[76]   *See* 927 F.3d 742, 748 (3d Cir. 2019).

[77]   *Id.* (quoting *Palardy v. Township. of Millburn*, 906 F.3d 76, 80-81 (3d Cir. 2018)).

[78]   *Id.* at 752 n.7 (citing *Baldassare v. New Jersey*, 250 F.3d 188, 195 (3d Cir. 2001)).

[79]   MSJ Br., Doc. 35 at 6 ("Defendants do not dispute that Plaintiff has established the first element of his *prima facie* claim for retaliation and that City Council's vote to terminate his employment constitutes an 'adverse employment decision.'"). Although it is eminently clear that association with a public union is constitutionally protected conduct, Houseknecht was an

Other than that, they argue that Houseknecht fails to allege a *prima facie* case of associational retaliation.[80] Therefore, to the extent Houseknecht relies on other retaliatory actions taken by Defendants to satisfy the second element, he must identify disputed issues of fact that such actions had a sufficiently deterrent effect on the exercise of associational rights. He must also identify disputed issues of fact regarding the existence of a causal relationship between Defendants' retaliatory acts and his protected conduct. If he does, Defendants may still "avoid liability if [they] can show by a preponderance of the evidence that [they] would have taken the adverse action 'even in the absence of the protected conduct.'"[81]

### A.    Defendants' Retaliatory Acts

Houseknecht identifies the first of Defendants' retaliatory acts as the discipline he received for missing his first day as a corporal, which occurred six days after he was promoted.[82] Defendants do not directly challenge that argument but appear to argue that the first alleged retaliatory act on their part is Mayes' Report and the subsequent discipline, which occurred four months after Houseknecht was promoted.

---

FOP member long before he was promoted to corporal. It is less clear that a plaintiff's promotion while a union member constitutes "constitutionally protected conduct." In many cases, the protected conduct at issue is a discrete act that itself has some association with a union, such as filing a grievance. Houseknecht may be correct in arguing that his promotion as an FOP member is sufficient for the first element, especially as he provides evidence that Young did not believe that FOP members should be supervisors. But as Defendants have conceded the first element, the Court will not undertake that inquiry.

[80]    *Id.* at 3.
[81]    *Baloga*, 927 F.3d at 752 (quoting *Miller v. Clinton Cty.*, 544 F.3d 542, 548 (3d Cir. 2008)).
[82]    *See* Opp. Br., Doc. 39 at 12.

In *Brennan v. Norton*, our Court of Appeals explained that "[d]etermining whether a plaintiff's First Amendment rights were adversely affected by retaliatory conduct is a fact intensive inquiry focusing on the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts."[83] "Consequently, '[t]o properly balance these interests, courts have required that the nature of the retaliatory acts committed by a public employer be more than *de minimis* or trivial."[84] "[C]ourts have declined to find that an employer's actions have adversely affected an employee's exercise of his First Amendment rights where the employer's alleged retaliatory acts were criticism, false accusations, or verbal reprimands."[85]

It appears from the record that the only "discipline" imposed upon Houseknecht following his failure to appear for his shift was "verbal counseling and [a] written reprimand," the latter of which was later "rescinded and re-issued due to being construed as discipline."[86] As explained in *Brennan*, those actions do not constitute the retaliatory conduct necessary to satisfy the second element of Houseknecht's retaliation claim.

However, "a plaintiff may be able to establish liability under § 1983 based upon a continuing course of conduct even though some or all of the conduct

---

[83] *Brennan v. Norton*, 350 F.3d 399, 419 (3d Cir. 2003) (quoting *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000)).

[84] *Id.* (quoting *Suarez Corp.*, 202 F.3d at 686) (alterations in original).

[85] *Id.* (quoting *Suarez Corp.*, 202 F.3d at 686).

[86] Internal Investigation Report, Doc. 34-5 at 36.

complained of would be *de minimis* by itself or if viewed in isolation."[87] In such a context, the court assesses the "cumulative impact" of the retaliatory actions to determine whether the actions may serve as a basis for the defendant's liability, "even though the actions would be *de minimis* if considered in isolation."[88] In *Brennan*, the court found some instances of retaliatory conduct at issue insufficient to demonstrate a continuing course of conduct and others sufficient.[89] The actions involved menial or tedious assignments, the refusal to recommend that the municipality extend the plaintiff's leave, a transfer to a different building, various citations, and other negative conduct and remarks directed towards the plaintiff.[90] However, the court noted that some of the acts that resulted in suspensions of the plaintiff from work could independently constitute retaliatory acts.[91]

The Court finds the situation here analogous to that presented in *Brennan* based on Defendants' status, their relationship with Houseknecht, and the nature of their acts. Young and each of the other Defendants had supervisory authority over Houseknecht. Each Defendant contributed to the Report or disciplining Houseknecht. Young had the ultimate authority to impose discipline based on the Mayes' findings in the Report, which Young found presented a "continuing course

---

[87] *Brennan*, 350 F.3d at 419 n.16.
[88] *Id.* at 422 n.17.
[89] *Id.* at 418-19.
[90] *Id.* at 418.
[91] *Id.* at 419.

of conduct."[92] A jury could infer that the discipline imposed for that continuing course of conduct reflects a campaign of retaliatory actions.[93]

As for the substance of Defendants' retaliation, Houseknecht has identified several anti-union statements from Miller, Mayes, and Young directed both at Houseknecht and other union members.[94] Such statements include but are not limited to Mayes' identification of Houseknecht as an FOP "attorney,"[95] and Miller's statement that "no one has the integrity to stand up to the FOP—to stand up to the FOP and Houseknecht and tell them to fall in line and be reasonable"[96].

Houseknecht also identifies instances where he was disciplined for violations that other officers were not disciplined for. For example, Officers Joshua Bell and Clinton Gardner were apparently never disciplined for late reports while Houseknecht was.[97] In addition, Houseknecht testified that no one had been disciplined the way he was for missing a day of work.[98] He also directs the Court's attention to Reeder's circumvention of former WBP Lieutenant Steven Helm— Reeder's immediate supervisor and FOP president—when reporting disciplinary

---

[92]   Young Dep., Doc. 34-1 at 17:10-20:1.

[93]   *See Griffin v. Township of Clark*, 2011 WL 1546910, at *3 (D.N.J. Apr. 21, 2011) (concluding that the defendant's denial of the plaintiff's requested overtime was sufficient to show retaliatory conduct)

[94]   Opp. Br. at 18-19; *see also Griffin*, 2011 WL 1546910, at *4 (noting that evidence of a police chief's private and public criticism of an officer-plaintiff "tend[ed] to show that an acrimonious relationship existed between [them] and would be sufficient to persuade a reasonable jury of an 'ongoing antagonism' between the parties during the relevant time period").

[95]   Internal Investigation Report, Doc. 34-5 at 131.

[96]   Helm Dep., Doc. 38-4 at 79:21-82:5.

[97]   *See* Helm Dep., Doc. 38-4 at 30:5-31:12.

[98]   *See* Houseknecht Dep., Doc. 34-10 at 228:10-230:10.

issues to Miller.[99] Reeder apparently did that at Miller's direction.[100] These facts are sufficient for a jury to conclude that Defendants made disciplinary decisions regarding Houseknecht "based on the exercise of [his] First Amendment rights."[101]

### B.      Causation

"If a public employee makes out the first two elements of a retaliation claim, he then bears the initial burden of showing that his constitutionally protected conduct was a 'substantial' or 'motivating factor' in the alleged retaliatory conduct."[102] Our Court of Appeals explained in *Suppan v. Dadonna* that "the plaintiff is not required to prove 'but for' cause in order to warrant a judgment in his favor."[103] It noted that the substantial/motivating factor test derives from the Supreme Court of the United States' opinion in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, where the Court required plaintiffs to provide more than evidence of disparate impact but "stressed that the plaintiffs were not required to show that a decision was 'motivated solely by a single concern, or even that a particular purpose was the dominant or primary one.'"[104]

An employee can meet the substantial/motivating factor test by demonstrating: (1) "an unusually suggestive temporal proximity between the

---

[99]   Opp. Br., Doc. 39 at 16-17.
[100]  *Id.*
[101]  *Brennan*, 350 F.3d at 419 (quoting *Suarez Corp.*, 202 F.3d at 686).
[102]  *Baloga*, 927 F.3d at 759 (citing *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000)).
[103]  *Suppan v. Dadonna*, 203 F.3d 228, 236 (3d Cir. 2000).
[104]  *Id.* (quoting 429 U.S. 252, 265 (1977)).

protected activity and the allegedly retaliatory action," (2) "a pattern of antagonism coupled with timing to establish a causal link,"[105] or, "if such evidence is lacking, an employee may nevertheless prove causation from the evidence gleaned from the record as a whole."[106] "It is important to emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's *prima facie* case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn."[107]

Defendants challenge the existence of a causal relationship on any of the three theories just referenced.[108] They challenge temporal proximity because four months elapsed between Houseknecht's promotion and the initiation of the Internal Investigation into his misconduct.[109] They challenge the existence of a pattern of antagonism because Houseknecht admitted to many—if not all—of the violations listed in the Report.[110] The Court disagrees.

Houseknecht first argues that he has demonstrated temporal proximity between his first day as a corporal and his being disciplined for missing a day of

---

[105] *Id.* (quoting *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)).
[106] *Id.* at 759 (citing *Conard v. Pa. State Police*, 902 F.3d 178, 184 (3d Cir. 2018)); *see also Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 795 (3d Cir. 2000) ("Where a reasonable inference can be drawn that an employee's [protected conduct] was at least one factor considered by an employer in deciding whether to take action against the employee, the question of whether the [protected conduct] was a motivating factor in that determination is best left to the jury.").
[107] *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 178 (3d Cir. 1997).
[108] *See* MSJ Br., Doc. 35 at 6-13.
[109] *Id.* at 8.
[110] *Id.* at 10-11.

work.[111] His theory appears to be that Young began to target him because Young did not believe union leaders should be allowed to be WBP supervisors.[112] Contrary to Defendants' position, the proper interval is not the time that elapsed between Houseknecht's promotion and the initiation of the Internal Investigation. The proper interval is the period between Houseknecht's promotion and the initiation of Defendants' alleged campaign of retaliation against him. That interval was six days, which is sufficiently close for a jury to infer causation.[113]

Furthermore, given that Defendants' retaliatory acts appear to be campaign of retaliation rather than discrete acts, the Court finds a jury could infer a causal relationship between Houseknecht's union association and Defendants' retaliation from the entire record. As referenced above, the record contains anti-union statements from Defendants and examples of their disparate disciplinary treatment of Houseknecht as compared to other officers. That conduct is also sufficient to create issues of fact as to causation.[114] Therefore, the Court concludes that Houseknecht has demonstrated a *prima facie* case of associational retaliation.

---

[111] Opp. Br., Doc. 39 at 12-13.

[112] *See* Young Dep. from *Helm v. Young*, Doc. 38-14 at 63:7-11 ("Q. [D]o you hold any belief as to whether a union president in a police department can also effectively serve as a supervisor? A. My personal belief is it should be a lower rank.").

[113] *See, e.g.*, *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 307 (3d Cir. 2012) (holding seven days sufficient); *Jalil.*, 873 F.2d at 708 (two days); *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 994 (8th Cir. 2011) (four days); *McCann v. Tillman*, 526 F.3d 1370, 1376 (11th Cir. 2008) (five days).

[114] *See Robinson v. Se. Pa. Transp. Auth., Red Arrow Div.*, 982 F.2d 892, 895 (3d Cir. 1993) (affirming trial court's denial of summary judgment for the defendant on the basis that defendant's supervisors "repeated[] disciplin[e]" of plaintiff "for minor matters'" and provocation of the plaintiff could support a causal relationship in the Title VII context).

### C.   Whether Defendants Would Have Disciplined Houseknecht Anyway

As explained above, if Defendants can show that there is no dispute of fact that they would have disciplined Houseknecht regardless of his protected conduct, summary judgment in their favor would be appropriate. In support of that argument, Defendants again rely on Houseknecht's admission to many—if not all—of the policy violations.[115] Defendants therefore argue that Houseknecht has "proffered no evidence that would discredit Defendants' reasoning for [their] actions."[116] The Court disagrees.

A jury could discredit Defendants' reasoning based on the evidence referenced above with respect to the first two elements of Houseknecht's claim— the lack of similar discipline for similar actions by other officers and the anti-union statements. Therefore, the Court concludes that a reasonable jury could determine that Defendants would not have disciplined Houseknecht if he was not an FOP member. Accordingly, summary judgment is inappropriate here.

---

[115] MSJ Br., Doc. 35 at 14-16
[116] *Id.* at 16.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion is denied.

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge